IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

                                  Criminal No. 18-2217 MV

    v.

POLETT CHARLIN REBOLLEDO,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Ms. Rebolledo's First Motion to Suppress. Doc. 23. The government timely responded [Doc. 25], and Ms. Rebolledo replied. Doc. 28. The Court held an evidentiary hearing on February 15, 2019. The Court, having reviewed the briefs, testimony, exhibits, and relevant law, and being otherwise fully informed, finds that the Motion is not well-taken and will be denied.

## BACKGROUND

This case concerns the interdiction of drugs at the Amtrak train station in Albuquerque, New Mexico. The following represents the Court's findings of fact, based on the transcripts and evidence submitted, as well as witness testimony.

Drug Enforcement Agency (DEA) Special Agent (SA) Jarrell Perry is stationed in Albuquerque and works on drug interdiction cases. Transcript (Tr.)[1] at 4:20–22. SA Perry has twenty years of experience with the DEA, approximately nineteen years of which have been in interdiction. Tr. at 5:2–3, 33:15–20.

---

[1] All references to the transcript are to the draft copy.

Prior to the incident in question, SA Perry had been monitoring Amtrak passenger manifests for individuals with one-way tickets who had changed their travel plans by a few days. Tr. at 5:15–25, 35:20–24.  He identified Polett Rebolledo as someone who was supposed to be traveling earlier in the week to Topeka.  Tr. at 5:19–25, 7:2–5, 36:24–37:5.  SA Perry testified, based on his experience, that Topeka, Kansas and Newton, Kansas are not popular destinations and he had "seen a lot of passengers traveling that had been arrested for transporting illegal narcotics to those destinations."  Tr. at 7:9–17, 60:11–15, 61:1–5.  Although others were traveling to Topeka, he did not contact those individuals.  Tr. at 39:18–20.  Aside from the passenger seated next to Ms. Rebolledo, SA Perry did not recall speaking to other passengers on the day at issue. Tr. at 41:12–17.  However, he stated that he would have continued to question passengers had he not arrested Ms. Rebolledo and taken her off the train.  Tr. at 63:14–24.  SA Perry also acknowledged that a number of other cities would qualify as source and destination cities for the transport of illegal narcotics.  Tr. at 61:15–62:19.

On June 16, 2018, Ms. Rebolledo was traveling on an eastbound Amtrak train, which she had boarded in San Bernardino, California the day before.  She was traveling alone to Topeka, Kansas and she was seated next to a woman who was also traveling alone.  Tr. 13:11–14.  SA Perry and DEA Task Force Officer (TFO) Seth Chavez were at the Amtrak station in Albuquerque to meet Ms. Rebolledo's train.  Tr. at 7:21–22.  They were dressed in plain clothes and each boarded the train in different coach cars as to not stand out.  Tr. at 7:24–8:2, 8:8–10.  SA Perry was looking for a seat that had a reservation for the passenger he identified as traveling alone to Topeka.  Tr. at 13:4–6.

When the train stopped in Albuquerque, Ms. Rebolledo stood up to get her tennis shoes from her luggage so that she could exit the train.  Tr. at 71:17–18.  She walked back to her bag, sat

2

next to it, and put her shoes on. Tr. at 72:18–73:5. Ms. Rebolledo testified that she observed SA Perry walking down the aisle towards her seat, where he proceeded to speak to the woman who was seated next to her. Tr. at 73:8–10, 19. She did not recall SA Perry speaking to any other passengers, which she found odd. Tr. at 89:7–19. SA Perry testified that he spoke to the passenger who was seated next to Ms. Rebolledo and traveling to Dodge City, Kansas by herself. Tr. at 39:21–24. He stated that he spoke briefly to the Dodge City passenger, in his limited Spanish, about her travel and asked to see her ticket. Tr. at 39:25–40:9. He denied asking the woman about Ms. Rebolledo. Tr. at 40:5–14. The audio recording for the encounter with Ms. Rebolledo's seatmate was not available at the hearing. Tr. at 40:15–18, 64:19–65:4.

SA Perry testified that he walked to the rear of the train and observed a woman, later identified as Ms. Rebolledo, sitting on a small bench near some luggage. Tr. at 14:10–15, 15:11–13, 42:14–16. The bench was identified in Government Exhibit 4. SA Perry walked into the adjoining car, but looked back through the window and observed Ms. Rebolledo walk forward towards the seat from which he had observed the Topeka and Dodge City tickets and spoken to the female passenger. Tr. at 16:6–9. SA Perry returned to the car. Tr. at 16:13–16, 43:1–5.

Ms. Rebolledo recalled that SA Perry proceeded towards the rear of the train, glancing at her as he passed by her. Tr. at 73:21–24. After he passed, she stood up to leave the train by walking past her seat towards the front exit, at which point the woman sitting next to her stopped her and told her that a police officer was looking for her. Tr. at 74:6–10, 98:18–21. She told Ms. Rebolledo that the officer had asked, "where's the girl sitting here?" Tr. at 74:9–10, 96:16–20.

SA Perry walked up to Ms. Rebolledo at a normal pace and stood in front of the seat behind her. Tr. at 17:22–18:2, 45:13–23. Using Government Exhibits 5 and 6, SA Perry identified where he was standing relative to Ms. Rebolledo, who was described as standing in front of her seat. Tr.

3

at 17:9–10.  Meanwhile, Ms. Rebolledo recalled that before she could ask her seatmate about the interaction with SA Perry, "he was already behind me."  Tr. at 74:10–11.  SA Perry testified that, at the time he initially questioned Ms. Rebolledo, TFO Chavez was not in the same car as him.  Tr. at 22:10–15.  He testified that he is 5'8" and was approximately 215 pounds at the time of the encounter.  Tr. at 59:17–19.  Meanwhile, Ms. Rebolledo is approximately 5'2" and 145 pounds. Tr. at 62:22–25, 88:16–22, 93:23–25.  She is a citizen of both the United States and Mexico, but lived in Tijuana, Mexico—or nearby—since age 16 and would cross into the United States daily to attend school and work.  Tr. at 75:5–6, 13–24.

SA Perry testified that he was mostly standing out of the aisle when he questioned Ms. Rebolledo.  Tr. at 22:3–8, 45:14–46:2.   However, Ms. Rebolledo recalled that they were both standing in the aisle.  Tr. at 81:17–21.  Regardless of the positioning, Ms. Rebolledo stated that SA Perry did not block her in or place himself between Ms. Rebolledo and the doors of the train car.  Tr. at 104:23–25.  However, later on in the interaction, Ms. Rebolledo recalled that she was between SA Perry and his partner such that she could not go forward or backward.  Tr. at 104:25–105:4.  At the time her bag was searched, Ms. Rebolledo was standing in the aisle and, while the agents were not blocking her path, "other people" were.  Tr. at 105:16–24.

SA Perry noted that the "general area was pretty open" because there were not many passengers in the area.  Tr. at 18: 6–10.  However, Ms. Rebolledo recalled that the train was "pretty crowded.  There was [*sic*] people in front of me, behind me.  I think it was pretty crowded."  Tr. at 87:4–7.  The presence of others made her feel "weird because [she] was the only one being talk to" and others were stopping to look at her.  Tr. at 87:9–13.  Ms. Rebolledo testified that her awkward and uncomfortable feelings affected how she responded to SA Perry because she "just

4

wanted everything to keep going as normal instead of everybody stopping and staring at what was going on."  Tr. at 87:20–23.

SA Perry displayed his DEA badge from his left back pocket, identified himself as a police officer, and asked permission to speak with Ms. Rebolledo.  Tr. at 18:13, 18:15–18, 19:24–20:1. As confirmed in the audio recording of the encounter, which was marked at the hearing as Government Exhibit 7, Ms. Rebolledo responded, "Uh, sure."  Tr. at 20:5–7; Ex. 7.  SA Perry testified that he shares many of the same responsibilities that a police officer would have, and vice-versa.  Tr. at 47:6–20.  However, SA Perry never informed Ms. Rebolledo that he works for the DEA, or that he is a DEA agent.  Tr. at 50:13–15, 50:21–24.  He testified that this was in part, because "pretty much everyone knows what a police officer is" but many people "don't know what DEA means."  Tr. at 66:8–14.  However, Ms. Rebolledo recognized that the DEA is "something big" and they deal with drugs.  Tr. at 80:16–81:2.  SA Perry also did not inform Ms. Rebolledo that she had a right to not answer his questions.  Tr. at 50:25–51:2.  Ms. Rebolledo testified that, had SA Perry told her she did not have to speak to him, "[i]t would have made a big difference." Tr. at 109:1–4.

SA Perry asked to see her ticket and she pointed to her cell phone.  Tr. at 20:8–11.  SA Perry testified that he asked Ms. Rebolledo where she was traveling.  Tr. at 21:7–8.  He testified that Ms. Rebolledo replied that she was going to Topeka and asked, "what [is] this all about?" but this portion was inaudible on the recording.  Tr. at 21:8–10, 49:1–7.  Ms. Rebolledo testified that she believes she asked him, "What's the problem? What do you want?"  Tr. at 77:22–78:1.  SA Perry responded, "No, ma'am."  Tr. at 49:8–11, Ex. 7.  He then explained that Amtrak did not have much security, so he was speaking with passengers for security reasons.  Tr. at 21:10–13, 50:3–12.

SA Perry testified that he asked Ms. Rebolledo details about her trip while she searched on her phone for her reservation. Tr. at 21:13–14, 17–20. SA Perry reviewed the reservation on her phone. Tr. at 22:21–25. He then asked Ms. Rebolledo for identification and details about her return. Tr. at 23:3–5, 25:17–18. SA Perry reviewed her identification and returned it to her in a matter of seconds. Tr. at 26:2–4.

Ms. Rebolledo recalled being questioned about her travel, but stated she did not want to continue speaking to SA Perry and wanted to know why he was asking her questions. Tr. at 78:5–8. She noted that she did not realize it was possible to refuse questioning by a police officer, in part based on her experience living in Mexico and having to do what a police officer says. Tr. at 78:9–20, 79:16–80:3, 83:10–15, 100:25–101:10. Ms. Rebolledo did not inform SA Perry about these experiences, and she testified that her interaction with police officers in the United States was very limited. Tr. at 79:5–15, 101:16–18.

Ms. Rebolledo commented, without prompt, on San Bernandino's appearance. Tr. 26:17–27:5. During cross-examination, Ms. Rebolledo admitted that throughout the encounter she was "trying to be as nice as possible, so that he would leave me alone" and agreed that SA Perry "sounded nice" in the recording as well. Tr. at 103:7–12. She admitted it "wasn't an interrogation" and the two maintained a "casual conversation" because she wanted "to keep it going so everybody would stop staring at me, or whatever the problem was, it would stop." Tr. at 103:13–15, 106:19–21, 109:23–24. She testified that her casual tone did not capture how she was feeling at the time. Tr. at 111:1–13. SA Perry testified that, at that point in the encounter when he was questioning Ms. Rebolledo about her trip, TFO Chavez still "wasn't in the area," though he may have been in a different area of the car and SA Perry did not see him. Tr. at 26:9–12.

SA Perry next asked Ms. Rebolledo if she had any luggage on the train with her. Tr. at 27:13. She reported having a purse and another piece of luggage. Tr. at 27:13–17, 52:16–21. SA Perry asked her where her luggage was located, and Ms. Rebolledo pointed toward the rear of the train car. Tr. at 27:17–20. He then "asked her if she could show me exactly where her luggage was located." Tr. at 27:20–22. SA Perry acknowledged that, during this interaction, he was looking forward and focused on Ms. Rebolledo such that he may not have noticed when TFO Chavez entered the car if it was from behind him. Tr. at 54:6–21. However, when he turned around to go to the back of the train, he did not see anyone. Tr. at 66:20–67:5.

Ms. Rebolledo walked back two or three seats and pointed to her black suitcase. Tr. at 27:27–28:1, 83:8–9. Ms. Rebolledo testified that she saw SA Perry's "partner," who was dressed similarly to him, in the vicinity. Tr. at 83:19–84:3. She stated that TFO Chavez stood behind her while SA Perry knelt down next to her bag. Tr. at 85:6–10. SA Perry explained to Ms. Rebolledo that sometimes passengers utilize the train to transport contraband, including weapons, illegal narcotics, and explosives. Tr. at 28:6–8. Ms. Rebolledo asked SA Perry a clarifying question ("What's that?"), then denied having any weapons with her. Tr. at 28:10–12, 58:3–59:6.

SA Perry then asked her whether she would consent for him to search her bag for contraband. Tr. at 28:13–14. He was already kneeling next to the bag when he asked to search the suitcase. Tr. at 106:22–25. Although the audio recording did not clearly record her response, SA Perry testified that Ms. Rebolledo replied, "Go ahead" and removed a combination lock from her luggage. Tr. at 28:14–17, 28:20–24, 55:18–22, 56:9–13. He stated, and the audio recording appears to confirm, that there was no discussion about the lock. Tr. at 56:1–6. Meanwhile, Ms. Rebolledo testified that, when asked if he could search her luggage, she replied, "Um, I guess" and then told SA Perry that there was a code on the luggage. Tr. at 85:22–86:1. She stated that she

gave him the code, but could not recall whether he opened it or if she did.  Tr. at 86:1–13, 101:22–25, 107:6–9.

SA Perry opened the luggage and removed the clothing.  Tr. at 29:6–7, 12–13.  He observed that the lining was raised, unzipped it, and found clear plastic wrapped bundles containing a clear crystalline substance that he believed to be crystal methamphetamine.  Tr. at 29:13–20.  According to SA Perry, TFO Chavez arrived at some point during the search.  Tr. at 29:21–22, 30:4–9.  SA Perry used his "arrest signal" to indicate to TFO Chavez that he identified illegal drugs and Ms. Rebolledo should be arrested.  Tr. 30:19–25.

The substance field-tested positive for the presence of methamphetamine and had a gross weight of 2.45 kilograms.  Tr. at 31:2–9.

SA Perry denied ever displaying a weapon to Ms. Rebolledo, touching her, threatening her, demanding that she do anything, or applying pressure to her in any way.  Tr. at 32:21–33:7.  Ms. Rebolledo similarly confirmed that SA Perry never told her that she had to do what he said, never threatened her, did not show her a weapon, and did not touch her or physically intimidate her.  Tr. at 105:25–106:8.  TFO Chavez did not do any of those things either.  Tr. at 106:12–14.

It is undisputed that ultimately, SA Perry discovered illegal narcotics in the interior lining of Ms. Rebolledo's luggage, and arrested her based on that discovery.  An Indictment was returned charging Ms. Rebolledo with Ms. Rebolledo with possession with intent to distribute 500 grams and more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. sections 841(a)(1) and (b)(1)(A).  Doc. 11.  Ms. Rebolledo filed this instant motion to suppress, seeking suppression of all evidence seized from her, all statements Ms. Rebolledo made on June 16, 2018 at the train station in Albuquerque, New Mexico, and any resulting evidence obtained as a result of the encounter.  Doc. 23 at 1.  The government opposes the motion.  Doc. 28.

The Court held an evidentiary hearing on the motion, during which the Court heard testimony from SA Perry and Ms. Rebolledo.  The government admitted into evidence an audio recording of SA Perry's encounter with Ms. Rebolledo on the train, and photographs of the layout of an Amtrak train.  In addition, a transcript of was submitted to the Court to assist in understanding the recording.  At the conclusion of the hearing, the Court took Ms. Rebolledo's motion under advisement.

## DISCUSSION

Ms. Rebolledo argues that, on June 16, 2018, SA Perry seized her in violation of the Fourth Amendment, and that her seizure led to involuntary consent to search her luggage. Specifically, Ms. Rebolledo contends that SA Perry targeted her for questioning, and that the manner in which SA Perry questioned her resulted in consent to search that was not voluntary. Because her consent to search was coerced, Ms. Rebolledo's argument continues, (a) all physical evidence seized from Ms. Rebolledo on June 16, 2018 at the Amtrak station, (b) all of Ms. Rebolledo's statements to DEA agent, and (c) all evidence obtained directly or indirectly as a result of the evidence illegally seized from, and statements made by, Ms. Rebolledo must be suppressed.  Doc. 23 at 1.

As described herein, Ms. Rebolledo has not established, by a preponderance of the evidence, that the encounter was nonconsensual or that SA Perry searched Ms. Rebolledo's luggage in violation of the Fourth Amendment.  Also, as described herein, the government has established by a preponderance of the evidence that, under the totality of the circumstances, Ms. Rebolledo's consent to search was voluntary.

I.    The Evidence Does Not Establish that Ms. Rebolledo was Seized in Violation of the Fourth Amendment.

Ms. Rebolledo first argues that she was seized under the Fourth Amendment and, thus, the evidence subsequently discovered should be suppressed.

A.    The Law on Seizure

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV.  "An investigative, nonconsensual detention constitutes a seizure under the Fourth Amendment."  *United States v. Briggs*, 720 F.3d 1281, 1284 (10th Cir. 2013).  A consensual encounter, on the other hand, does not implicate the Fourth Amendment.  "An initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *INS v. Delgado*, 466 U.S. 210, 215 (1984) (quotations omitted); *see also United States v. Zapata*, 997 F.2d 751, 756 n.3 (10th Cir. 1993) ("[T]he nature of the police-citizen encounter can change—what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa.").   In order to determine whether an encounter is a seizure or a consensual encounter, the Court must "evaluate the totality of the circumstances, with the government bearing the burden of proof."  *United States v. Parra-Garcia*, 1 F. App'x 778, 781 (10th Cir. 2001); *see also United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012).

"If a reasonable person would feel free to terminate the encounter, then he or she has not been seized."  *United States v. Drayton*, 536 U.S. 194, 200 (2002).  The relevant inquiry thus "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *Id.* at 202.  "The focus of the test is on the coercive effect of police

10

conduct, taken as a whole on a reasonable person." *United States v. Spence*, 297 F.3d 1280, 1283 (10th Cir. 2005).   The Supreme Court has held that the "reasonable person" test presupposes an innocent person. *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions," asks to examine identification, or requests consent to search luggage, "provided that they do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 434, 437 (internal citations omitted); *see also United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006); *Muehler v. Mena*, 544 U.S. 93, 101 (2004) (noting that the Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure").

In *United Sates v. Rogers*, 556 F.3d 1130 (10th Cir. 2009), *cert. denied*, 556 U.S. 1288 (2009), the Tenth Circuit set forth the following non-exhaustive list of factors to be considered in making this determination:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

556 F.3d at 1137–38; *see also United States v. Hill*, 199 F.3d 1143, 1147–48 (10th Cir. 1999).

"[N]o single factor is dispositive." *Jones*, 701 F.3d at 1313.  These factors are not exhaustive, and the Court may consider other relevant factors. *See United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017); *Rogers*, 556 F.3d at 1137–38; *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005).  The Court also may consider whether an officer indicated to the person that he is free to leave. *Jones*, 701 F.3d at 1313; *see also Hill*, 199 F.3d at 1149 (an officer's failure to specifically advise that a citizen did not have to answer his questions did not render the encounter a non-consensual seizure under the Fourth Amendment).

B.  Application of the Law to the Instant Case

Ms. Rebolledo first argues that she was seized under the Fourth Amendment because a reasonable person would not have felt free to decline SA Perry's request or otherwise terminate the encounter.  As an initial matter, there is a recording of the encounter, which provides evidence of the actual words spoken and the tone used by the parties during encounter, though some portions of the recording are not audible.  The Court finds that both Ms. Rebolledo and SA Perry were credible witnesses.  Their accounts are consistent with the audio recording, though none of these pieces of evidence resolve the dispute about when TFO Chavez arrived and where he was standing.  The recording appears to support SA Perry's recollection that Ms. Rebolledo opened the locked luggage for him, in contrast to Ms. Rebolledo's account that she told him the code for the luggage.  The Court finds, applying the *Rogers* factors, the government has met its burden of demonstrating that a reasonable person in Ms. Rebolledo's position would have felt free to decline SA Perry's request to search or otherwise terminate the encounter.

Under the first *Rogers* factor, there was no "threatening presence of several officers." To the contrary, the only officers on the train were SA Perry and TFO Chavez.  Only SA Perry approached Ms. Rebolledo, near the back of the train by her seat, while TFO Chavez was—at least initially—in a different car.

Ms. Rebolledo, however, argues that this factor militates against a finding of a consensual encounter because SA Perry and TFO Chavez subjected her to intimidation and coercion.   In her motion, Ms. Rebolledo states that SA Perry "gazed intently at her as he passed."  Doc. 23 at 5. She states that he did not approach any other passengers and focused only her.  Doc. 23 at 4. Then, before she could question her seatmate about the man, SA Perry appeared, identified himself a police officer, showed her his badge, and began questioning her.  Ms. Rebolledo adds

12

that the subsequent presence of TFO Chavez "effectively pinn[ed] Ms. Rebolledo to her seat."
Doc. 23 at 6.  Although she highlighted the physical difference between SA Perry and herself,
Ms. Rebolledo testified at the hearing that SA Perry did not physically intimidate her.

      The presence of two officers is insufficient to establish the threatening presence of
"several" officers.  *See United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012) (finding
that the first factor did not weigh against a finding of voluntary consent where only two police
officers were present at the scene and only one of those officers approached defendant).  Further,
SA Perry's audio recording demonstrates that there was nothing threatening about the way he
conducted his encounter with Ms. Rebolledo.  Accordingly, the first factor militates in favor of a
finding of a consensual encounter.

      Second, neither SA Perry nor TFO Chavez "brandished" a weapon.  Third, with regard to
physical touching by an officer, Ms. Rebolledo confirmed that SA Perry never touched her.  Ms.
Rebolledo does not dispute these factors.

      Fourth, while Ms. Rebolledo may have found SA Perry's tone of voice or manner of
questioning to be intimidating, she testified that SA Perry did not demand that she comply with
his requests.  Rather, Ms. Rebolledo agreed that SA Perry "sounded nice" and their conversation
was "casual."  This testimony falls far short of establishing that SA Perry used "aggressive
language or tone of voice" indicating that Ms. Rebolledo's compliance with his request to search
was "compulsory."

      With regard to the fifth and sixth factors, SA Perry did not retain Ms. Rebolledo's
personal effects for a prolonged period of time, but rather returned to Ms. Rebolledo her
identification and ticket seconds after reviewing them, and he did not ask Ms. Rebolledo to
accompany him to another location for questioning.

With regard to the seventh factor, while the encounter occurred in public, the space in which it occurred was the enclosed space of a train. As a result of the spatial limitations of the train, during the encounter, Ms. Rebolledo was confined to the aisle of the train, and TFO Chavez, at some point standing in the nook, made it such that Ms. Rebolledo could not go forward or backward. The recording suggests, too, that SA Perry was blocking the aisle at some point, as evidenced by a passenger who had to say, "excuse me" to get by. However, compared to *Royer* where the individual was questioned in an office the size of a storage closet, the public train car is significantly larger. *See Florida v. Royer*, 460 U.S. 491 (1983). Ms. Rebolledo testified that during her initial encounter with SA Perry, they may have both been in the aisle— but she also testified that the exit was in the direction of where she was standing and, thus, SA Perry was not blocking her exit. Later, during the search of her suitcase, Ms. Rebolledo was standing in the aisle while SA Perry was on his knee in front of her, and TFO Chavez was standing behind her in a nook of the train. Ms. Rebolledo testified that the officers were not blocking her exit, but other passengers were. Accordingly, the seventh factor weighs in favor of a consensual encounter as Ms. Rebolledo largely retained the ability to freely move about the train car.

With regard to the eighth and final factor, the encounter occurred in the presence of other members of the public, namely, the other train passengers. Indeed, Ms. Rebolledo testified that the train was "pretty crowded" during her encounter with SA Perry. Typically, the public nature of the encounter weighs in favor of voluntariness. *See, e.g.*, *Royer*, 460 U.S. at 503. However, the public nature of this encounter made Ms. Rebolledo feel that several passengers were staring at her. In order to "keep it going" and end the encounter as quickly as possible, she complied with SA Perry's requests to avoid further embarrassment. Ms. Rebolledo states that psychology

14

research suggests that individuals in a confined setting, such as train passengers, who have "no

time to deliberate will automatically translate an officer's polite request as a demand."  Doc. 28

at 7 (citing Janice Nadler, NO NEED TO SHOUT: BUS SWEEPS AND THE PSYCHOLOGY OF

COERCION, 2002 Sup. Ct. Rev. 153, 186–203, 206–08 (Univ. of Chicago, 2002).  She states that

this is particularly relevant considering the social context.  Doc. 28. At 8.  To support her

position, Ms. Rebolledo cites Tenth Circuit law for the proposition that people may feel more

coerced in a public setting, "where they might be embarrassed to decline police requests in the

hearing and view of others."  *United States v. Little*, 18 F.3d 1499 (10th Cir. 1994) (en banc).

This dictum is consistent with Ms. Rebolledo's testimony that the presence of others on the train

while she was being questioned affected how she responded to SA Perry.

      While the space of the train may have somewhat limited Ms. Rebolledo's movement and

the presence of the public made her feel awkward and uncomfortable, this alone is not enough to

tip the balance toward finding that Ms. Rebolledo's encounter with SA Perry was not consensual.

Rather, under all of the circumstances here, as evidenced by the totality of the relevant factors,

SA Perry's conduct would not have conveyed to a reasonable person that "he was not free to

decline SA Perry's requests or otherwise terminate the encounter."  *Bostick*, 501 U.S. at 439.

Accordingly, the Court finds that Ms. Rebolledo was not seized under the Fourth Amendment.

II.    <u>Ms. Rebolledo's Consent to Search Was Voluntary.</u>

      Ms. Rebolledo additionally argues that, regardless of whether she was seized under the

Fourth Amendment violation, the totality of the circumstances demonstrates that her consent was

not freely, voluntarily, and expressly given.  Ms. Rebolledo argues that SA Perry and TFO Chavez

subjected her to intimidation and coercion.  She states that SA Perry did not inform her of her right

to refuse consent, that his behavior "demanded" permission to search her bag, and that she did not

give her consent freely. The government argues that the consent was valid. According to Ms. Rebolledo, the involuntary nature of her consent to the search of her belongings provides a separate, independent basis for suppression of the evidence discovered pursuant to her consent to search and her subsequent statements.

A.    The Law on Voluntariness

Warrantless searches are presumptively unreasonable, subject to "a few carefully established exceptions," including voluntary consent to search. *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). The government bears "the burden of proving that consent is given freely and voluntarily." *Jones*, 701 F.3d at 1318 (citation omitted). Voluntariness of consent "is a factual issue, determined through the totality of the circumstances." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).

"[F]or consent [to search] to be valid" the Tenth Circuit requires that: "'(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) the government must prove consent was given without duress or coercion, express or implied.'" *Guerrero*, 472 F.3d at 789 (quoting *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992)).

In order to meet the first prong of the voluntariness requirement, "a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications so long as they are sufficiently comprehensible to a reasonable officer." *Guerrero*, 472 F.3d at 789–90. Notably, an officer is not "required to inform a defendant explicitly that he is free to go before requesting permission to search, . . . or to refrain from renewing his request for consent after a defendant has at first declined it." *Id.* at 790; *see also United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001) (holding that the fact that appellant initially told the officer that he could not search his car did not render his subsequent consent involuntary).

16

When evaluating whether consent given in the confines of a train, as it was here, is free of coercion under the second prong of the voluntariness test, the relevant inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *United States v. Bostick*, 501 U.S. 429, 436 (1991). In *Bostick*, the Court deemed the following factors relevant to the Fourth Amendment reasonableness determination: (1) whether the agent advised the defendant that he had the right to refuse consent, (2) whether the agent in any way threatened the defendant (*i.e.*, the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. *Id.*

In *United States v. Drayton*, the Supreme Court applied the *Bostick* framework to the facts of the case before it and determined that the respondents' consent to the search of their luggage and their persons was voluntary, explaining:

> Nothing Officer Lang said indicated a command to consent to the search. Rather, when Lang requested to search Brown and Drayton's persons, he asked first if they objected, thus indicating to a reasonable person that he or she was free to refuse. Even after arresting Brown, Lang provided Drayton with no indication that he was required to consent to a search. To the contrary, Lang asked for Drayton's permission to search him ("Mind if I check you?"), and Drayton agreed.

563 U.S. 194, 206 (2002).

The Court specifically noted that although the officer "did not inform the respondents of their right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that their consent was voluntary, so the searches were reasonable." *Id.* at 207. The Court rejected not only the notion that "police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search," but also the suggestion that "a presumption of invalidity attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate." *Id.* Rather, the Court stated that "the

totality of the circumstances must control, without giving extra weight to the absence of this type of warning." *Id.*

"A defendant's subjective state of mind may be relevant to some degree on the issue of the voluntariness of his or her consent, but it is not determinative if it does not overcome other indicia that the defendant's consent was freely and voluntarily given." *United States v. Huerta-Rodriguez*, 2010 WL 4929044, at *10 (D.N.M. Oct. 20, 2010) (Browning, J.) (citing *Hill*, 199 F.3d at 1150). However, such vulnerabilities to coercion by officers and compliance with requests have been deemed irrelevant to the objective reasonable person test "other than to the extent that [the vulnerability] may have been known to the officer and influenced his conduct." *Hill*, 199 F.3d at 1149 (internal citations omitted).

B.    Application of the Law to the Instant Case

Ms. Rebolledo argues that the circumstances of her encounter with SA Perry establish that she did not voluntarily consent to the search of her belongings. As set forth herein, the Court finds that her consent to the search of her luggage was voluntary.

First, the parties do not dispute that Ms. Rebolledo's consent to SA Perry's search of her bag was "unequivocal and specific." *Guerrero*, 472 F.3d at 789. Although this portion of the audio recording is inaudible, both SA Perry and Ms. Rebolledo testified that she provided verbal consent to search her luggage by pointing it out to SA Perry when asked and telling him to either "go ahead" and search it or "sure," it was okay to search. There is also evidence that Ms. Rebolledo either input the combination on the lock, or provided the information to SA Perry so he could open the locked bag. Accordingly, the first prong of the voluntariness requirement is met.

Second, Ms. Rebolledo's consent was "given without duress or coercion, express or implied." *Guerrero*, 472 F.3d at 789. This latter inquiry involves a similar inquiry as to that

18

above, in assessing whether the encounter was consensual.  *See United States v. Thompson*, 546 F.3d 1223, 1226 (10th Cir. 2008) (citing *Spence*, 397 F.3d at 1283).  As explained above, the Court has reviewed the relevant factors and found that Ms. Rebolledo's encounter with SA Perry was consensual and now reviews the additional factors raised by Ms. Rebolledo.

In disputing the voluntary nature of her consent, Ms. Rebolledo argues that by representing that he was a police officer on the bus for "security purposes," rather than disclosing that his real purpose was to discover illegal narcotics, SA Perry engaged in a coercive tactic that weighs against a finding of voluntary consent.  Indeed, "deception and trickery are among the factors that can render consent involuntary."  *Harrison*, 639 F.3d at 1278.  Specifically, "[w]hen government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by coercion or duress."  *Id.* at 1278–79.  The court is counseled to be "especially cautious when this deception creates the impression that the defendant will be in physical danger if he or she refuses to consent to the search."  *Id.* at 1279.  Notably, however, "not all deception or trickery will render a search invalid."  *Id.* at 1278.

The Court agrees that SA Perry misled and misinformed Ms. Rebolledo by identifying himself as a police officer, rather than as a DEA officer, and by representing that he is there for security purposes, without clarifying that his purpose is drug interdiction.  The Court is troubled by SA Perry's lack of transparency regarding his position and his role.  Nonetheless, SA Perry here did not misrepresent that he was *only* searching for weapons and/or explosives, but rather indicated, among other things, he was also interested in locating illegal narcotics.  Accordingly, there is no reason to believe that Ms. Rebolledo was less inclined to refuse SA Perry's

19

questioning and his repeated requests for consent to search in light of his vague and ambiguous description of his purpose as "security." *See United States v. Villaba*, No. CR 13-0664 JB, 2013 WL 4782206, at *29–30 (D.N.M. Aug. 21, 2013) ("Villaba may have felt more patriotic by complying with Walsh's request to search his bag for security purposes, as opposed to a search for law enforcement purposes, but the fact remains that he consented to the search.").

Further, nothing in SA Perry's misrepresentation created the impression that Ms. Rebolledo would be in physical danger if she refused to consent. Nor did SA Perry's statement that he was a police officer present on the bus for security purposes reasonably convey to Ms. Rebolledo that she was not free to decline SA Perry's requests. *See id.* Accordingly, in this case, SA Perry's misrepresentation, although a relevant factor for consideration, viewed within the totality of the circumstances, does not tip the balance in favor of finding coerced consent.

Ms. Rebolledo also argues that the manner in which SA Perry addressed her is important, as his sequence of questioning led to a situation where Ms. Rebolledo "really didn't have a choice" but to consent. Doc. 28 at 4. She states that SA Perry's questioning "was a calculated effort, honed over 20 years of practice, to cause people to accede to his wishes, even when they would not have wanted to do so." *Id.* at 5. Ms. Rebolledo supports her position by contrasting the present case to that of *United States v. West*, 219 F.3d 1171 (10th Cir. 2000). Doc. 23 at 7. She states that SA Perry "applied a subtle but unyielding pressure," and his persistence led to her "inability to resist SA Perry."

However, here there is no evidence that SA Perry's questioning of Ms. Rebolledo "reached that level of implied coercion" and the recording calls into question the alleged "rapid" nature of SA Perry's questions. *See United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 1026 (2003). First, nothing about SA Perry

20

moving forward on the train to speak with Ms. Rebolledo or asking her "rapid questions" was coercive.  A voluntary encounter is not transformed into a coercive one "simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434.  There is also no evidence that SA Perry then engaged in "accusatory, persistent, or intrusive questioning." Rather, he asked Ms. Rebolledo questions in a logical manner regarding her travel, whether she had any luggage on board, and whether she could show him the luggage.  As noted above, while SA Perry's repeated requests for permission to search may have been "persistent," he was not also accusatory or intrusive with his questioning.  Similarly, there is no evidence from the audio recording that used an aggressive tone or that he displayed an intimidating or coercive demeanor. To the contrary, as Ms. Rebolledo admitted, the conversation was rather friendly and conversational, and the entire interaction lasted less than ten minutes.

In addition, Ms. Rebolledo argues that the racial and gender imbalances of the interaction rendered her consent involuntary because "a reasonable person" in this context should be a "reasonable single Hispanic woman."  Doc. 23 at 5, 8.  Ms. Rebolledo contends that she was "especially vulnerable to police encounters" because of her race, gender, and size.  Doc. 23 at 8 (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 277 (2011); *see also United States v. Easley*, 293 F.Supp.3d 1288 (2018)).  While the Tenth Circuit has rejected similar arguments that a court should consider subjective characteristics like race as part of the reasonableness analysis in the context of Fourth Amendment *seizure*, such arguments can be considered in the context of assessing voluntariness of *consent*.  *United States v. Easley*, 911 F.3d 1074, 1081 (10th Cir. 2018) ("While the test for voluntariness of consent accounts for some subjective characteristics of the accused, the Fourth Amendment's seizure analysis has always been an objective one." (internal citations omitted)).  Still, the Tenth Circuit has encouraged Courts to avoid adopting a

21

standard that states or implies "all women, all minorities, or all young people are always more vulnerable to coercion." *Little*, 18 F.3d at 1505. While Ms. Rebolledo's race and gender can thus be considered in weighing the voluntariness of her consent, it is not dispositive.

Admittedly, Ms. Rebolledo testified that she felt intimidated and that she cooperated because she thought that she had no true choice but to consent. Nothing about SA Perry's actual conduct, however, reasonably conveyed that he would not accept Ms. Rebolledo's refusal to consent. As discussed above, Ms. Rebolledo gave her consent shortly after the encounter began; in the interim, SA Perry engaged in no use of the coercive *Rogers* factors. In light of the evidence regarding the circumstances of the encounter, Ms. Rebolledo's testimony that she merely went along with the request because her race, gender, and experiences with police officers in Mexico is insufficient to establish that her consent was coerced. *See Hill*, 199 F.3d at 1150 (While Mr. Hill's "subjective state of mind" regarding police officers "may be relevant to some degree to the issue of the voluntariness of [his] consent," . . . in this case, it does not overcome the other indicia that Mr. Hill's consent was freely and voluntarily given.") (citation omitted); *Guerrero*, 472 F.3d at 790 (finding unpersuasive defendant's contention that his consent was given under duress, indicating that he was "just being submissive because . . . [the officer] was going to search the car anyways," where, based on the relevant factors, a reasonable person would have felt free to leave or deny the officer's request).

Finally, Ms. Rebolledo argues that SA Perry's failure to advise her of her right to refuse SA Perry's request to search weighs against the voluntariness of her consent. SA Perry did not inform Ms. Rebolledo of her right to refuse consent to search. However, the Supreme Court in *Drayton* made clear that an officer is not required to inform citizens of the right to refuse consent to search, and that no presumption of invalidity attaches where such information is not provided.

Indeed, the Court stated that no "extra weight" is to be given to the absence of this type of warning, and that instead, the totality of the circumstances control.  536 U.S. at 201.

Here, as in *Drayton*, SA Perry requested permission to search, rather than demanding consent to search through his actions, tone, or words.  *See id.*  As discussed above, a reasonable person would not have interpreted SA Perry's request to indicate that he would not take "no" for an answer.  The totality of the circumstances thus indicates that Ms. Rebolledo's consent was voluntary.  *See id.*

Under the totality of the circumstances, SA Perry's conduct would not have conveyed to a reasonable person that she was not free to decline SA Perry's request for permission to search Ms. Rebolledo's luggage, or otherwise terminate the encounter with SA Perry.  The government thus has met its burden of demonstrating that Ms. Rebolledo's consent was given without duress or coercion and, accordingly, has satisfied the second prong of the voluntariness requirement. Because the government has established that Ms. Rebolledo's consent was given freely and voluntarily, it necessarily follows that there is no basis to suppress either the evidence discovered pursuant to the search of Ms. Rebolledo's belongings or her statements.

## CONCLUSION

Ms. Rebolledo has not met her burden of establishing that either SA Perry or TFO Chavez seized her in violation of the Fourth Amendment.  The government has met its burden of establishing that Ms. Rebolledo's consent to the search of her luggage was freely and voluntarily given.  Accordingly, there is no basis to suppress either the evidence discovered pursuant to the search of her belongings, her statements, or evidence obtained directly or indirectly as a result of the evidence seized from Ms. Rebolledo on June 16, 2018.

23

**IT IS THEREFORE ORDERED** that Ms. Rebolledo's First Motion to Suppress [Doc. 23] is denied.

Dated this 16th day of April, 2019.

_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**